IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ROBERT D. COATES,     *
             *
     Plaintiff,   *
             *
vs.          *   No. 4:04cv00869 SWW
             *
             *
             *
NUVELL FINANCIAL SERVICES *
CORPORATION,     *
             *
     Defendant.  *

<u>MEMORANDUM AND ORDER</u>

   This is a case of alleged employment discrimination on the basis of race (black) as well

as retaliation for filing previous Charges of Discrimination with the Equal Employment

Opportunity Commission ("EEOC") (and otherwise complaining of discrimination) and is

brought pursuant to 42 U.S.C. §§ 2000e *et seq*., and 42 U.S.C. § 1981.  Before the Court is a

motion of the defendant, Nuvell Financial Services Corporation ("Nuvell"), for summary

judgment [doc.#19].  The plaintiff, Robert D. Coates ("Coates"), has responded in opposition to

Nuvell's motion, Nuvell has filed a reply to Coates' response, and Coates has filed a surreply to

Nuvell's reply.  For the reasons that follow, the Court finds that Nuvell's motion for summary

judgment should be and hereby is granted.

I.

   Nuvell provides financial credit services for certain automobile dealerships by, among

other things, conducting credit checks on prospective automobile purchasers and recommending

the length of time for the loan.[1]  There are three distinct positions at Nuvell with the essential job

function of making credit decisions based on loan applications.  These positions are Credit

Analyst Trainee, Credit Analyst, and Senior Credit Analyst.

Coates was hired by Nuvell on March 4, 1997, for the position of Purchaser, which

entailed investigating loan files, calling customers, insurance interviews, and putting together the

loan documentation that was provided by the dealerships.  Coates remains employed at Nuvell.

On August 14, 2000, Coates filed a Charge of Discrimination with the EEOC alleging he

was denied promotion due to race discrimination and due to retaliation based on an EEOC

Charge filed by his mother in 1998.  On November 4, 2000, Coates was promoted into the

position of Credit Analyst Trainee.  This promotion was the result of a mediated EEOC

settlement between Coates and Nuvell in October 2000.

Coates participated in one-on-one training for approximately the first ninety days that he

held the position of Credit Analyst Trainee.  On January 12, 2001, Coates received a Credit

Analyst Trainee Evaluation in which he was rated unsatisfactory in several categories, met the

standard in others, and exceeded the standard in one.  Coates refused to sign this evaluation,

claiming racial discrimination, retaliation, and harassment by Human Resources and

management.  As a result of Coates' complaints, a meeting was held following which Coates'

evaluation was revised in part and Coates signed and accepted the revised version.

The amount of time that an employee remains in the position of Credit Analyst Trainee is

---

[1] Unless otherwise indicated, all facts set forth in today's Memorandum and Order are those as to which there is no dispute based on a comparison of the parties' Statements of Undisputed Material Facts, including Coates' specific admission of certain assertions made by Nuvell in its Statement.  *See also* Local Rule 56.1(c), which provides that "[a]ll material facts set forth in the statement filed by the moving party ... shall be deemed admitted unless controverted by the statement filed by the non-moving party ..."

dependent on the employee's level of experience, as well as his or her performance in the position.  On April 7, 2001, some five or six months after being promoted to Credit Analyst Trainee, Coates was promoted to the position of Credit Analyst.

Nuvell has an audit process by which the Auditing Department audits on a daily basis those funded credit decisions made by the Credit Analyst Trainee, Credit Analyst, or Senior Credit Analyst based on Nuvell's written credit policy, or those decisions in which the dealer received a payment, the day following funding.  Auditors are assigned particular employees to audit each month and auditor assignments are rotated every thirty days to prevent the same auditor from auditing the same employee or same area on a regular basis.  Each credit decision that is audited is given one of four categories: (1) "okay"; (2) "lower program"; (3) "excessive risk"; and (4) "unacceptable."  All audits that are conducted are sent to the Credit Department management for review, but only those decisions that are deemed "unacceptable" require action by management.  Regarding "unacceptable" decisions, management can override the decision of the auditor, or in the alternative, issue appropriate disciplinary action with regard to the Credit Analyst Trainee, Credit Analyst, or Senior Credit Analyst responsible for the decision.  In addition to those audits conducted by the Auditing Department, managers in the Credit Department randomly perform audits on their employees, subject to the same limitations as those audits conducted by the Auditing Department.

Pursuant to Nuvell's Employee Manual, there exists a progressive discipline scheme.  First, a "Performance Development Plan" ("PDP") serves as documentation of an official coaching session between a supervisor and subordinate employee.  A PDP does not in any way result in a tangible change in the terms of employment or working conditions of an employee; it

simply serves as written documentation of areas for improvement.  If the employee has been issued a PDP, *i.e.*, previously counseled regarding an issue, but there is no correction of the problem, a "Performance Improvement Plan" ("PIP") is issued to that employee.  PIPs impact an employee's compensation and an employee who has received a PIP receives a lesser increase in their annual merit increase and, if the employee is eligible for incentive pay, he or she is deemed ineligible for such pay during the time in which the PIP is active.  Typically, a PDP precedes a PIP.  Management does, however, have discretion as to which level of discipline is appropriate based on past performance and past positions held by an employee.  In this respect, an employee may be issued a PIP without first receiving a PDP if the infraction warrants.

In addition, Nuvell generally applies its progressive discipline policy to each infraction of an individual employee, as opposed to combining all infractions of a single employee.  If, for example, an employee violated the attendance policy, the employee would generally be issued a PDP.  Following this action, if that same employee failed to show improvement with regard to attendance, he or she would generally be issued a PIP to document the uncorrected conduct.  In those cases in which an employee engages in more than one policy infraction within the same or a short period of time, each infraction is typically dealt with separately in terms of progressive discipline.  For example, if an employee was currently on a PDP for an attendance infraction, and subsequently made credit decisions that were in violation of Nuvell's credit policy, that employee, unless circumstances warranted otherwise, would typically receive a second PDP addressing inappropriate credit decisions and would not automatically receive a PIP for inappropriate credit decisions simply because he or she had a current PDP for attendance issues. In this respect, each infraction generally stands alone with regard to the discipline process.

Nuvell's progressive discipline policy has the purpose of allowing employees to correct their performance.  If an employee makes necessary corrections, but later exhibits additional performance deficiencies, they will once again receive disciplinary action at the appropriate step based on management discretion.[2]

As previously noted, on April 7, 2001, some five or six months after being promoted to Credit Analyst Trainee, Coates was promoted to the position of Credit Analyst.  Of the current Credit Analysts and Senior Credit Analysts in the Credit Department, all white employees placed in the position of Credit Analyst Trainee, with the exception of one, remained in that position for a period longer than five months.

One year after being promoted to the position of Credit Analyst, Coates, on April 7, 2002, received his annual Performance Development Appraisal.  Coates felt there were discrepancies in this review regarding the objectives listed for his position and discussed the information he thought was inaccurate with the appropriate managers.  As a result, Nuvell management made corrections and issued Coates an adjusted review.  Each rating on Coates' April 7, 2002 performance appraisal, which Coates acknowledged was not discriminatory or retaliatory, fell in the category of meeting or exceeding standards, and his overall score for this appraisal fell in the category of "met the standard."  Coates received a merit increase as a result of this appraisal that adjusted his bi-weekly salary upward.

One year later, on April 7, 2003 (two years after being promoted to the position of Credit Analyst), Coates received a second annual Performance Development Appraisal, each rating of which fell in the category of either meeting or exceeding standards.  Coates' overall score for

---

[2] There also is a Performance Development Appraisal.  These performance appraisals are done annually on all employees and are non-disciplinary in nature.

this appraisal was "met the standard" and, as a result, Coates received a merit increase that adjusted his bi-weekly salary upward. Coates was given the opportunity to make comments with regard to this appraisal but he wrote "No Comments" in the space provided.

On October 15, 2003, Coates received a PDP that addressed his violations of Nuvell Credit Policy on two specific deals. Coates' manager was Stephen Stanley, a Credit Manager whose responsibilities included overseeing and reviewing credit decisions that are made by Credit Analyst Trainees, Credit Analysts, and Senior Credit Analysts.[3] The duration of this PDP was 90 days. Nuvell states that Coates violated Nuvell's credit policy on minimum monthly income for the type of loan sought, cosigners, delinquent accounts, and use of qualifying credit. Nuvell states that its credit policy outlines situations in which cosigners are required for an application and, further, under what circumstances cosigners may sign onto a contract. Despite Nuvell's clearly stated credit policy, Coates admits he approved a contract in which there were two applicants, neither of which had sufficient income to qualify on their own, and that the co-applicant lacked qualifying credit and made below the minimum monthly income requirement pursuant to Nuvell's credit policy. Coates, however, stating that he in the past has consistently been told to do whatever is necessary to get the deal funded, maintains that he had asked for assistance on this issue and was told to proceed, and states that the credit policies of Nuvell are often vague and, depending on the manager, the policy is applied differently.

Regarding the second unacceptable decision addressed in his October 15, 2003 PDP, Nuvell states that Coates violated Nuvell credit policy when he pulled credit reports from all three of the credit bureaus without justification, despite Nuvell's credit policy prohibiting such

---

[3] Nuvell uses a system of rotating managers (which Coates at times refers to as supervisors) at various intervals. Thus, the various PDPs and PIPs referenced in this action will often involve different managers.

pulling of credit reports, and, in addition, this decision was unacceptable because the applicant did not have sufficient income for the program approved, did not have auto credit, and had been thirty days delinquent on his or her mortgage three different times in the previous twelve month period.[4]  Coates, however, states that he had previously been instructed in his January 12, 2001 evaluation that he needed to work on being very flexible with the dealers and looking for any way to put a deal together and take care of any problem they may have.  With respect to credit reports, Coates, while claiming at one point there was no policy at the time prohibiting the pulling of credit reports from all three bureaus, states that another Black employee, Wonda London, was told by her manager, Kevin Cheatham, in February 2004 that she must make sure to review the entire credit bureau on each and every deal so as not to overlook derogatory credit, and that she must pull a second credit bureau on all deals when she finds an account included in bankruptcy, even if no bankruptcy is listed in the public records section.[5]  In any case, Coates refused to sign this PDP because, according to the "Employee comments" section of the PDP, "Not enough time to list comments due to mgmt needs today. Per Greg Johnson/Stephen Stanley."

On December 1, 2003, and again on January 30, 2004, Coates received a PIP.  Each of these PIPs was issued for 60 days.  Nuvell states that Coates' December 1, 2003 PIP, which referenced two decisions, was issued to him because, despite the PDP he received on October 15,

_____

[4] The applicants referenced in the various PDPs and PIPs are not identified by name and their gender is unknown.

[5] Coates cites to a February 6, 2004 PDP issued to London in making this assertion, but the Court is unable to locate any February 2004 PDP in the record.  In any case, to the extent Coates is pointing to the London situation as an example of another employee being counseled differently than he for the same conduct, he does not explain – and it is not clear to the Court – how the pulling of a second credit report when a problem is noted in the first report conflicts with Nuvell's credit policy that prohibits the pulling of credit reports from all three bureaus without sufficient justification.  In this respect, it is not apparent how London's conduct – aside from her being a fellow black employee – is sufficiently comparable to that of Coates.

2003, he made two credit decisions that were in violation of Nuvell's credit policy that addresses treatment of judgments and qualifying credit.  Coates' manager at this time remained Stephen Stanley.  The first decision that was addressed on Coates' December 1, 2003 PIP was the approval of an applicant who had made a previous application four months earlier and had been declined.  Since the applicant's earlier application, a large collection had been documented on his or her credit file.  Despite the previous denial and the decline of credit since that denial, Coates approved the application with no notes to justify his reversal of the earlier decision.

The second decision addressed on Coates' December 1, 2003 PIP was the approval of an application despite very little positive credit, namely, the applicant indicated he/she was self-employed and the credit file included only two accounts, one of which was a loss and the other a $6,000 high credit account that didn't report adequately in the bureau.  In addition, Coates made no mention to the dealer of Nuvell's need for tax returns of the applicant to verify income.

Coates does not specifically dispute the factual basis for the December 1, 2003 PIP but states that he was previously instructed to do whatever it takes to make the deal work, that it was issued in retaliation for his having complained about prior acts of discrimination, and that white analysts who committed similar infractions were only issued PDPs.  He also states that Nuvell's credit policy addressing treatment of judgments and qualifying credit is applied strictly against black employees, and specifically those who have complained about discriminatory treatment.

Coates' January 30, 2004 PIP reviewed an audit of Coates' decisions over a one-week period of time, and, states Nuvell, was also issued as a result of Coates' continued failure to show improved performance.  Coates' manager at this time was Tanya Hall, a Credit Manager.  According to Nuvell, this audit revealed that there were nine conservative decisions, or decisions

in which the contract was not captured because Coates could have offered the applicant a better interest rate based on their credit.  In addition, states Nuvell, there were five applications that were declined by Coates despite the applicants' good credit history and scores.

Coates does not specifically dispute the factual basis for the January 30, 2004 PIP but states he was doing what he was instructed to do, namely to do whatever was necessary to make the deal work, and then being punished for following this directive.[6]  Coates states that Ms. Hall had only supervised him for one month before issuing this PIP and did not have an opportunity to objectively evaluate his performance,[7] and that he was issued this PIP while a white analyst, Amanda Strickland, was issued a PDP for similar conduct.[8]  Coates also claims he was issued the January 30, 2004 PIP in retaliation for having complained about prior acts of discrimination.

Nuvell states that as each incorrect credit decision resulted in a loss of approximately $9,500.00 to Nuvell, a decision was made to remove Coates from the position of Credit Analyst.  Coates claims he was removed from his Credit Analyst position in retaliation for having complained about prior acts of discrimination, and on February 11, 2004, Coates filed a Charge of Discrimination with the EEOC alleging he is "being subjected to harassment, a difference in

---

[6] The Court does not understand Coates' defense of his actions regarding the January 30, 2004 PIP – that he was instructed to do whatever was necessary to make the deal work and then being punished for doing so – as the criticism reflected in this PIP is for Coates' decisions and actions that resulted in *failed* deals that should have been approved.

[7] Coates also states that Ms. Hall stated that she was told by Tom Jester, Senior Vice President of Credit, to issue the PIP.  This, of course, constitutes hearsay and may not be considered by this Court in addressing Nuvell's motion for summary judgment.  *See, e.g., Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993) (inadmissible material not "properly available to defeat or support the motion").

[8] The December 4, 2003 PDP issued to Strickland that is referenced by Coates reflects that Strickland was counseled for approving 11 deals that should not have been approved – directly opposite of the actions referenced in Coates' January 30, 2004 PIP, *see* n.6, *supra* – , declining 7 deals that could have been approved, structuring a deal on a vehicle with excessive miles, approving deals from former Nuvell customers who paid poorly, and not following up on her approvals.  This was Strickland's first disciplinary action, however, and, unlike Coates, there is no indication that Strickland had previously been counseled for such actions but failed to show improvement.  Clearly, then, Strickland's PDP is not sufficiently comparable to that of Coates' January 30, 2004 PIP.

treatment and disciplinary actions in retaliation for filing a racial discrimination charge against the company in violation of Title VII...”

On February 13, 2004, Coates received a PIP for approving two unacceptable deals.  The first deal was deemed unacceptable, states Nuvell, as the applicant had a bankruptcy that was discharged a year earlier and Coates used an auto that was reporting as a voluntary repossession as qualifying credit and there was no other credit paid through or since the bankruptcy.  Nuvell states this deal was discovered by the Quality Control Department during their daily account review.  The second deal, states Nuvell, which was approved by Coates on February 3, 2004, violated Nuvell's policy pertaining to term limits based on year model and mileage, despite this policy being addressed in a meeting with all Credit Analysts on January 30, 2004.  The vehicle in question was a 2001 model with 42,000 miles and Coates approved a 72-month term.  The manager for this PIP was Tanya Hall.

Nuvell states that a review of accounts in February 2004 showed that despite Nuvell's attempts to improve Coates' performance, he continued to make decisions that violated Nuvell's credit policy.  Coates does not specifically dispute the factual basis for the February 13, 2004 PIP but states that he was issued this PIP in retaliation for having complained about prior acts of discrimination.  He also states that he was instructed to do whatever is necessary to fund the deals and white Credit Analysts did not receive PIPs for similar conduct.

On Friday, February 13, 2004 (the same day he was issued the PIP), Tom Jester, as previously noted Senior Vice President of Credit, and Greg Johnston, Vice President of Credit, met with Coates to offer him the option of either demotion or termination and gave him the weekend to make a decision.  On Monday, February 16, 2004, Coates met with Jester and

notified him that he had decided to accept the demotion from the position of Credit Analyst to the position of Senior Discounter.  At the time Coates was offered the option of resignation or demotion on February 13, 2004, no one at Nuvell had knowledge that Coates had filed his February 11, 2004 EEOC Charge as this information had not yet been received by Human Resources, let alone communicated to any of Coates' managers.  Coates does not dispute this but does maintain that "management" was well aware of his prior EEOC activities and his complaints of discrimination as noted throughout his performance appraisals, PDPs and PIPs.  In any case, Coates, following the February 16, 2004 meeting with Jester, was placed into training for the position of Senior Discounter, after which he was assigned to a Discounting team. Subsequently, on March 1, 2004, Coates filed a Charge of Discrimination with the EEOC alleging that he is "being subjected to harassment, a difference in treatment, disciplinary [sic] and demoted in retaliation for filing a racial discrimination charge against the company in violation of Title VII ..."

On August 5, 2004, Coates was issued a PIP for continued performance deficiencies, specifically, failure to complete funding of a contract in a timely manner and failure to call automobile dealers on a daily basis to inform them of the status of contracts.  Coates' manager for this PIP was Greg King, and its duration was 30 days.  Coates was specifically counseled in this PIP that all contracts must be funded on the same day that they are assigned, or the next day prior to 8:00 a.m.  It was noted that Coates did not utilize overtime opportunities to complete his work in a timely manner and that there were complaints from dealers regarding timely return of their telephone calls.  Coates does not specifically dispute the factual basis of this PIP but states that Nuvell violated its progressive step discipline policy by issuing him a PIP rather than first

issuing him a PDP.  Nuvell, however, states that Coates, having previously worked as a Discounter for three years with training, and having been disciplined for performance inadequacies, was for this reason first given a PIP instead of a PDP, although Coates notes he had not worked as a Discounter since October 2001 and again reiterates Nuvell violated its progressive step discipline policy.

Each time Coates received a disciplinary action, he expressed that he felt he was being discriminated against based on his race and retaliated against for filing a previous charge. Specifically, Coates told Nuvell management that he felt that he was being discriminated and retaliated against on October 15, 2003, December 1, 2003, and January 30, 2004 when he was issued either a PDP (on October 15, 2003) or a PIP (on December 1, 2003 and again on January 30, 2004).

Coated filed this lawsuit on August 24, 2004.  On September 22, 2004, Coates filed a Charge of Discrimination with the EEOC referencing therein the August 5, 2004 PIP and claiming he should have been placed on a PDP instead, and that he is "being discriminated against because of my race (black) and in retaliation for filing discrimination charges and a lawsuit against my employer, in violation of Title VII ..."[9]

On September 29, 2004, Coates received another PIP for failure to meet minimum performance standards, namely funding less than half the number of contracts that other employees in his department were funding, and his turnaround time was not in compliance with Nuvell's expectations.  The duration of this PIP was 30 days and his manager at this time was

---

[9] It is not clear if Coates is claiming his August 5, 2004 PIP was issued in retaliation for *this* lawsuit, which of course had yet to be filed, or some other lawsuit of which the Court is unaware.  Coates' previous EEOC charges in which he claimed retaliation did not reference any previously filed lawsuit, but only charges of discrimination.  To the extent Coates is referring to his mediated EEOC settlement in October 2000, he does not indicate that there was ever a "lawsuit" associated with this settlement.

Tom Jester.  Coates does not specifically dispute the substance of this PIP but states, citing his own deposition – Coates Depo. Vol. II at 50 –, that he was out on Family Medical and Leave ("FMLA") and was only given 74 contracts but was written up for not meeting 95 contracts, and he was not informed that the turnaround time was 2 days.  Coates admits that he might not have been given as many contracts during the month of September due to having been on FMLA but, despite it being noted on his PIP that his September 2004 goal had been adjusted accordingly for FMLA,[10] states that he was not given an adjustment to meet his monthly goal.[11]

On October 22, 2004, Coates filed a Charge of Discrimination with the EEOC alleging his September 29, 2004 PIP was issued to him in retaliation for filing previous EEOC charges and filing this lawsuit.  On February 10, 2005, Coates, with leave of this Court, filed an amended complaint to encompass the October 22, 2004 EEOC charge.[12]

---

[10] Specifically, it is noted on this PIP that "[t]aking into consideration that (MTD) Robert has been absent three full working days, his average number of contracts purchased per day is 3.3 per day," somewhat below the next closest employee's contracts purchased per day of 5.8.

[11] According to Nuvell, Coates states in his deposition that he was only given 74 contracts for the month so that he could not meet the goal of 95 and that he is not sure why he was only given 74 contracts, but then states, after acknowledging that his claim is that his goal was not adjusted for FMLA time, that his being off on FMLA "may have something to do with it as far as why I wasn't given the full number of contracts for that particular month."  *See* Br. in Support of Nuvell's Mot. for Summ. J. at 85.  The page reference supplied by Nuvell for this exchange – Coates' Depo. Vol. II at 50 – is apparently incorrect (as page 50 of Vol. II has no such exchange, *see* Nuvell's Ex.30 to its Mot. for Summ. J.) and the Court cannot otherwise find this exchange in the record.  Coates does not dispute this exchange, however, citing this same incorrect page citation in his Resp. to Nuvell's St. of Mat. Facts at ¶ 88.  As noted by Nuvell, it appears Coates is claiming in this exchange, in a somewhat contradictory argument, that he was purposefully not given enough contracts to meet his goal for the month in question and then, in the same argument, claiming he did not have any contracts removed from his goal while he was out on FMLA.

[12] Coates also references in his response to Nuvell's motion for summary judgment a May 18, 2005 PIP and a July 25, 2005 PIP.  These PIPs are not, obviously, included in the February 10, 2005 amended complaint and, other than the mere date of their issuance and a brief description by Coates of their subject matter, *see* Coates' Br. in Opposition to Def.'s Mot. for Summ. J. at 12, they are not included in the record nor otherwise addressed by Coates or Nuvell.  These PIPs thus appear not to be at issue in this action.  To the extent they are, this Court, for the same reasons attendant to the other PIPs at issue in this action, grants summary judgment on any claim Coates is making that these PIPs were discriminatory and/or retaliatory.

II.

Nuvell moves for summary judgment on grounds that (1) Coates cannot establish the prima facie elements of racial discrimination or retaliation with regard to events prior to his demotion, the demotion itself, or events following the demotion, and (2) even if Coates had established a prima facie case of racial discrimination or retaliation with regard to one or more of these incidents, Nuvell had legitimate, non-discriminatory reasons for its actions and Coates cannot establish that these reasons were pretextual.  Nuvell argues that there are no genuine issues of material fact with respect to these issues and that it is entitled to summary judgment as a matter of law.[13]

A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rest on mere allegations or denials of

---

[13] Claims under Title VII and § 1981 are analyzed in the same manner.  *See, e.g., Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1045-46, 1051 (8th Cir. 2002); *Clearwater v. Independent Sch. Dist.*, 231 F.3d 1122, 1124 n.2 (8th Cir. 2000); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997).

his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citations omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. (citation omitted).

B.

In his response to Nuvell's motion for summary judgment, Coates states he is contending that "similarly situated white employees receive more favorable terms and conditions of their employment with [Nuvell] in the following ways: a) promotional opportunity into the Credit Analyst positions, b) assistance from management to help one succeed as a Credit Analyst, and c) discipline."  Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 19.  In this respect, Coates contends he "has presented sufficient evidence which creates a genuine issue of material fact as to whether he was denied an employment opportunity to become a Credit Analyst, and after becoming a credit analyst, [he] has presented sufficient evidence, which demonstrates that he was a victim of discrimination and retaliation, by unfair disciplinary measures," *see id.* at 42, and that he "has also presented sufficient evidence, creating a genuine issue of material fact, as to whether his demotion was motivated by unlawful retaliatory motives."  *Id.*

15

1.

Because Coates presents no direct evidence of race discrimination, this Court applies the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *See Davis v. KARK-TV, Inc.*, 421 F.3d 699, 704 (8th Cir. 2005).  Under this burden-shifting framework, a plaintiff  first must demonstrate a prima facie case of employment discrimination.  *Id.*  To establish a prima facie case of discrimination, the plaintiff must show that: (1) he is a member of a protected class; (2) he met the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated employees that were not members of the protected class were treated differently.  *Id.*  A minimal evidentiary showing will satisfy this burden of production.  *Id.*  If the plaintiff presents a prima facie case of employment discrimination, the burden shifts to the employer to rebut the plaintiff's prima facie case by articulating a legitimate, nondiscriminatory reason for its adverse employment decision.  *Id.*  The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence.  *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005) (citation omitted).  If the employer successfully makes this showing, the burden shifts back to the plaintiff to show the employer's proffered reason was a pretext.  *Davis*, 421 F.3d at 704.

With respect to Coates' claim of retaliation, this Court likewise applies the burden-shifting analysis established in *McDonnell Douglas* to this claim as no direct evidence of retaliation has been presented.  *See Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005).  Under this burden-shifting framework, a plaintiff  first must demonstrate a prima facie case of retaliation.  *Id.*  A minimal evidentiary showing will satisfy

16

this burden of production.  *Davis*, 421 F.3d at 704.  To establish a prima facie case of retaliation,

the plaintiff must show (1) he engaged in a protected activity, (2) he suffered an adverse

employment action, and (3) a causal connection between the protected activity and the adverse

employment action.  *Eliserio*, 398 F.3d at 1078-79.  If the plaintiff presents a prima facie case of

retaliation, the burden shifts to the employer to rebut the plaintiff's prima facie case by

articulating a legitimate, nondiscriminatory reason for its adverse employment decision.  *Id*. at

1078.  The burden to articulate a nondiscriminatory justification is not onerous, and the

explanation need not be demonstrated by a preponderance of the evidence.  *Wallace v. Sparks*

*Health System*, 415 F.3d 853, 860 (8th Cir. 2005).  If the employer successfully makes this

showing, the burden shifts back to the plaintiff to present evidence that (1) creates a question of

fact as to whether the employer's proffered reason was pretextual and (2) creates a reasonable

inference that the employer acted in retaliation.  *Logan v. Liberty Healthcare Corp*., 416 F.3d

877, 880 (8th Cir. 2005).


2.

    First, to the extent Coates is claiming any of the events following his November 2000

promotion into the position of Credit Analyst Trainee (which was the result of a mediated EEOC

settlement between Coates and Nuvell in October 2000), up to his first PIP on December 1,

2003, constitutes actionable discrimination and/or retaliation, the Court finds that Nuvell is

entitled to summary judgment on these claims as Coates has failed to demonstrate adverse

employment action, a necessary element of a prima facie case for both his claims of

discrimination and retaliation.  Within this time period, Coates challenges, as far as discipline is

17

concerned, only an April 16, 2003 PDP for personal phone calls and his October 15, 2003 PDP

that, as previously noted, addressed Coates' violations of Nuvell Credit Policy on two specific

deals.[14]  Coates has failed, however, to demonstrate that he suffered an adverse employment

action with respect to either of these incidents, namely, "a tangible change in working conditions

that produces a material employment disadvantage."  *Jones v. Reliant Energy Arkla*, 336 F.3d

689, 691 (8th Cir. 2003) (citing *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850,

853 (8th Cir. 2000)).  "'Termination, reduction in pay or benefits, and changes in employment

that significantly affect an employee's future career prospects meet this standard.'"  *Id.*  "'Mere

inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse

employment action.'"  *Sallis v. University of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) (quoting

*Cruzan v. Special Sch. Dist. # 1*, 294 F.3d 981, 984 (8th Cir. 2002)).  PDPs, as previously noted,

do not in any way result in a tangible change in the terms of employment or working conditions

of an employee; it simply serves as written documentation of areas for improvement.  Coates

simply has not demonstrated that he suffered, for purposes of Title VII and § 1981, an adverse

disciplinary action prior to his December 1, 2003 PIP.[15]

Concerning Coates' somewhat cryptic claim that he was denied an opportunity to become

a Credit Analyst, the Court notes that events that occurred prior to the EEOC mediated

---

[14] *See* Coates' Br. in Opposition to Def.'s Mot. for Summ. J. at 10-11, wherein Coates sets forth a "history" of his "disciplinary actions."  *See also* Coates' Surreply Br. in Opposition to Def.'s Mot. for Summ. J. at 5.  Coates apparently does not include in the record his April 16, 2003 PDP, and the Court thus has not referenced this PDP in its recitation of the factual background.

[15] Although the October 15, 2003 PDP might figure in Nuvell's progressive discipline scheme, Coates does not argue, and the Court does not find from that fact alone, that this PDP was subsequently used as a basis for adverse action.  *See Burchett v. Target Corp.*, 340 F.3d 510, 518 (8th Cir. 2003) (negative performance review is not in itself an adverse employment action, and it is actionable only if the employer subsequently uses that review to alter the terms or conditions of employment to the detriment of the employee).  Cotes' December 1, 2003 PIP stands on its own and, consistent with Nuvell's progressive discipline scheme, could have been issued as is even in the absence of the October 15, 2003 PDP.  In any case, as will be seen, Coates has not demonstrated that Nuvell's legitimate, nondiscriminatory reasons for the October 15, 2003 PDP were pretextual.

settlement are not, of course, at issue in this action.  With respect to events following this settlement, Coates does not allege, for purposes of establishing a prima facie case of discrimination and/or retaliation, that his remaining in the Credit Analyst Trainee position for longer than 90 days (five to six months) following the EEOC mediated settlement resulted in a tangible change in the terms of his employment or his working conditions.  Moreover, Coates acknowledges that the amount of time an employee remains in the position of Credit Analyst Trainee is dependent on the employee's level of experience, as well as his or her performance in the position, and he acknowledges that of the current Credit Analysts and Senior Credit Analysts in the Credit Department, all white employees placed in the position of Credit Analyst Trainee, with the exception of one, remained in that position for a period longer than five months.  The Court thus would grant summary judgment on any claim that Coates' remaining in the Credit Analyst Trainee position for longer than 90 days constituted discrimination and/or retaliation. This, then, resolves Coates' claim that he was denied an opportunity to become a Credit Analyst – Coates was in fact given that opportunity as a result of the EEOC mediated settlement – and the Court grants summary judgment on any claims following Coates' November 2000 promotion into the position of Credit Analyst Trainee up to his first PIP on December 1, 2003, that he claims constitutes actionable discrimination and/or retaliation.[16]

3.

---

[16] Even had Coates established a prima facie case of discrimination and/or retaliation with respect to these actions, the Court would grant summary judgment on these actions for the same reasons summary judgment is granted on the remaining actions at issue – Coates has not demonstrated that Nuvell's legitimate, nondiscriminatory reasons for these actions were pretextual.

The Court  now turns to the remaining employment actions alleged by Coates to be discriminatory and retaliatory: (1) December 1, 2003 PIP; (2) January 30, 2004 PIP; (3) February 13, 2004 PIP; (4) February 16, 2004 demotion to Senior Discounter; (5) August 5, 2004 PIP; and (6) September 29, 2004 PIP.  Coates, as previously noted, does not specifically dispute in his response to Nuvell's motion for summary judgment and statement of material facts the underlying factual basis for these PIPs and his demotion, or that Nuvell articulated legitimate, nondiscriminatory reasons for each of these actions.  Rather, Coates contends that he was the victim of disparate treatment and retaliation when he was continuously placed on PDPs and PIPs and demoted for issues that similarly situated white employees were not and that this evidences pretext.  Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 22, 41.  Accordingly, given that Nuvell has proffered legitimate, nondiscriminatory reasons for these adverse employment actions taken against Coates, and Coates has presented whatever evidence he has to show that the proffered reasons were a pretext for discrimination and retaliation, this Court, although it is far from clear, will assume that Coates has presented a prima facie case of discrimination and retaliation with respect to these employment actions and will focus on the pretext stage of the *McDonnell Douglas* burden-shifting framework, *see Rodgers*, 417 F.3d at 856 (Colloton, J., concurring), beginning first with Coates' discrimination claim.[17]

a.

Where a pretext argument is based on comparisons of employees, a plaintiff must show

---

[17] The Court will, however, discuss those aspects of Coates' retaliation claim which the Court finds do not suffice to establish causation for purposes of a prima facie case of retaliation.

that employees are similarly situated in all relevant aspects.  *Harvey v. Anheuser-Busch, Inc.*, 38

F.3d 968, 972 (8th Cir. 1994).  The test to determine whether employees are "similarly situated"

to warrant a comparison to Coates is a "rigorous" one.  *Id.   See also Rodgers*, 417 F.3d at 853;

*Equal Employment Opportunity Commission v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003).[18]

"'Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of

proving that he and the disparately treated [employees] were similarly situated in all relevant

respects.'" *Id.* at 775-76 (quoting *Lynn v. Deaconess Medical Ctr.-West Campus*, 160 F.3d 484,

487 (8th Cir. 1998)).  "Specifically, the individuals used for comparison must have dealt with the

same supervisor, have been subject to the same standards, and engaged in the same conduct

without any mitigating or distinguishing circumstances." *Id.*  at 776.


i.

Coates begins his response to Nuvell's motion for summary judgment on his

discrimination claim by setting forth raw generic employment statistics.  He states that in 2002

Nuvell employed 853 persons, with whites representing 58.5%, blacks representing 37.0%,

Hispanics representing 2.9%, and Asians representing 1.2% (black males accounting for 6.5% of

the overall workforce in the Little Rock division of Nuvell); that in 2003, Nuvell employed 853

persons, with whites representing 60.7%, blacks representing 37.5%, Hispanics representing

3.0%, and Asians representing 1.2% (black males accounting for 7.2% of the overall workforce

---

[18] For purposes of establishing a prima facie case of disparate treatment, the Eighth Circuit in *Rodgers* adopted a "low-threshold" standard for determining whether employees are similarly situated as the burden of establishing a prima facie case of disparate treatment is not onerous.  417 F.3d at 852-53.  At the pretext stage, however, the test for determining whether employees are similarly situated is a "rigorous" one.  *Id.* at 853.  Hence, this Court's determination, on this record at least, to proceed directly to the pretext stage of the *McDonnell Douglas* burden-shifting framework in addressing whether the employees identified by Coates were similarly situated.  *See id.* at 856 (Colloton, J., concurring).

in the Little Rock division of Nuvell); that in 2004, Nuvell employed 962 persons, with whites representing 58.9%, blacks representing 35.6%, Hispanics representing 2.7%, and Asians representing 1.0% (Black males accounting for 7.8% of the overall workforce in the Little Rock division of Nuvell); and that in 2005, Nuvell employed 962 persons, with whites representing 56.25%, blacks representing 38.98%, Hispanics representing 2.75%, and Asians representing 1.38% (black males accounting for 7.8% of the overall workforce in the Little Rock division of Nuvell). *See* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 3-4. Coates additionally states that during the years 2001, 2002, 2003, 2004, 2005, Nuvell hired 28 Credit Analyst Trainees, of whom 22 were white, 5 were black, and 1 was Hispanic. *Id.* at 4. He goes on to state that out of the 22 white Credit Analyst Trainees, 20 were promoted into the Credit Analyst position, which equates to a promotion rate of 91% for whites, while out of the 5 black Credit Analyst Trainees, 3 were promoted into Credit Analyst positions, which equates to a promotion rate of 60% for blacks. *Id.* at 4-5.[19]

Coates' proffered statistical evidence concerning Nuvell's hiring practices appears to relate to his claim that he was denied an opportunity to become a Credit Analyst, a claim upon which the Court has already granted summary judgment. However, Coates also proffers statistical evidence that addresses discipline. In this respect, Coates begins by stating that of the 44 individuals hired "off the street" into Credit Analyst positions during the years 2001, 2002, 2003, 2004, and 2005, 7 were black and 35 were white. *See* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 5. Coates states, however, that of the 7 blacks hired into Credit

---

[19] Coates also presents raw generic statistics regarding completion rates for Nuvell's leadership training program. Coates does not set forth information concerning selection criteria for the program or why certain employees failed to complete the program, however, and he does not dispute that the program in any case is not specific to Nuvell Credit. *See* Eisenhauer Supp. Aff. at ¶ 11.

Analyst positions, 3 were terminated and 1 was demoted.  *Id.*  He goes on to state that 50% of the individuals who were either hired or promoted into Credit Analyst positions, and who were either terminated or demoted, were black, while white employees made up 40%, and that since 2001, Nuvell has terminated 28 employees, 18 or 64.3% of whom were black, with blacks representing roughly 36% of Nuvell's overall workforce.  *Id.* at 5-6.  Coates next states that Nuvell placed a total of 34 employees on a PDP during 2001, 2002, 2003, 2004, and 2005, with whites accounting for 22 or 64.7%, and blacks accounting for 9 or 26%, and that during those same years, Nuvell placed a total of 17 employees on a PIP, with whites accounting for 10 or 58.8% and blacks accounting for 5 or 29.4%.  *Id.* at 7.  Of the 5 blacks placed on a PIP, states Coates, all suffered an adverse employment action – two being demoted and three terminated –, while of the 10 whites placed on a PIP, three suffered an adverse employment action – two being terminated and one demoted – and the one who was demoted was later promoted despite having been placed on two PIPs, each for 90 days.  *Id.*  Coates additionally states that of the 17 Credit Analysts placed on a PIP, blacks suffered more so, not only in punishment, but also in frequency of being placed on a PIP.  *Id.*  He states one black employee was placed on a PIP on four separate occasions, and that he (Coates) was placed on a PIP on three separate occasions.  *Id.* Coates goes on to state that there were 7 employees (two blacks and five whites) who were placed on a PIP on two occasions, and the remaining eight employees (one black, two Hispanics, and five whites) were each placed on one PIP.  *Id.* at 7-8.

Assuming Coates' evidence concerning Nuvell's hiring practices is relevant to his remaining claims concerning discipline, and considering also the statistical evidence that does appear to address these claims, the Court finds that this evidence is insufficient to establish

pretext as it consists of "simplistic demographic evidence."  *See Bogren v. Minnesota*, 236 F.3d

399, 406 (8th Cir. 2000) (noting that generic employment statistics, without more, are not

probative of specific employment decisions), *cert. denied*, 534 U.S. 816 (2001).  In *Hutson v.

McDonnell Douglas Corp.,* 63 F.3d 771 (8th Cir. 1995), the Eighth Circuit recognized that

statistical evidence "may support a finding of pretext, particularly where there are independent,

direct grounds for disbelieving the employer's explanation for discharge." 63 F.3d at 778

(internal quotations omitted); *see also Kim v. Nash Finch Co*., 123 F.3d 1046, 1059 (8th

Cir.1997) (in addition to *other evidence* that the proffered reason was false, pretext was

established by evidence that out of 3,500 employees, only 2 management employees in 25 years

were nonwhite).  Thus, statistical evidence is probative of pretext when it analyzes the treatment

of comparable employees.  *Hutson*, 63 F.3d at 777.  The broad statistical evidence Coates

presents, however, is insufficient to establish a genuine issue of pretext in that there is no

independent evidence to support a finding of pretext (as will be seen).  In this respect, this

generic statistical evidence fails to address the various facts and circumstances underlying these

statistics and, thus does not illustrate whether any of these for the most part unidentified

employees were similarly situated in all relevant respects, such as whether the individuals

referenced in these statistics dealt with the same managers, were subject to the same standards,

and engaged in the same conduct without any mitigating or distinguishing circumstances.[20]

*Harvey*, 38 F.3d at 972; *Kohler Co.*, 335 F.3d at 776.  Coates has not, with these raw generic

employment statistics, created a genuine issue of material fact as to whether "similarly situated

white employees receive more favorable terms and conditions of their employment ...

---

[20] Those employees that are identified and offered for comparison will be discussed *infra*.

24

[concerning] discipline," *see* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 19,[21]

and these statistics simply are not probative of the reasons for the specific adverse employment

actions taken against him.  *See LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 848 (1st Cir.1993),

*cert. denied,* 511 U.S. 1018 (1994) ("[S]tatistical evidence in a disparate treatment case, in and

of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its

decision to dismiss an individual employee.") (cited with approval in *Bogran,* 236 F.3d at

406)).[22]


## ii.

Although Coates' raw statistical evidence does not serve to illuminate any issues

regarding alleged disparate treatment, Coates does offer specific white employees for

comparison to support his argument that "similarly situated white employees receive more

favorable terms and conditions of their employment ... [concerning] discipline," *see* Coates' Br.

---

[21] In addition, the Court does not find a genuine issue of material fact with respect to any claim that "similarly situated white employees receive more favorable terms and conditions of their employment with [Nuvell] in ... assistance from management to help one succeed as a Credit Analyst ..." Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 19.  When asked at his deposition to list any employees who received such guidance, Coates responded, "I have a list of them, but I can't call them per name at this time.  But I will give them to my attorney."  Coates Depo., Vol. I, at 31.  Later, he states he knew certain white employees were receiving assistance because he would overhear their conversations (although he did not indicate how they were similarly situated to him).  Coates Depo., Vol. I, at 35.  When asked at his follow up deposition whether he had such a list as he indicated he would give his attorney, Coates responded, "I can give you a list right now," and proceeded to list six white employees.  Coates Depo., Vol. II, at 45.  Coates did not indicate how these employees were similarly situated, however, and when asked how he knew they received guidance to which blacks did not, he again replied because they told him and also because he overheard conversations among these employees.  *Id.* at 45-46.  Such evidence hardly constitutes admissible evidence raising a genuine issue of material fact on this issue, *see, e.g., Thien,* 8 F.3d at 1310 (inadmissible material not "properly available to defeat or support the motion"), and this evidence is in any case deficient in failing to indicate how Coates and these employees were similarly situated in all relevant respects.  Coates also references an affidavit of Wonda London, *see* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 19 (citing London Aff. at ¶ 15 [Ex. MM]), as previously noted a fellow black employee, but her affidavit similarly mentions names without specifying how those employees were similarly situated.

[22] Aside from lacking relevant context, the Court notes that the raw generic statistics as presented by Coates do not, on their face, illustrate such disparities that would immediately give one pause.

in Opposition to Nuvell's Mot. for Summ. J. at 19, those employees being Will Anderson, Jessie

Hubbard, Jennifer Matheny, Laura Matthews Boole, Cheri Pruett, Aaron Rocha (who Coates

states is Hispanic), Joann Smith, Shelly Sefcik, and Amanda Strickland.  Coates, however, has

failed to provide this Court with a complete disciplinary history of most of these employees such

that an appropriate comparison can be made.  In any case, when that history that can be

discerned from the record is examined, it is clear that these employees were not disciplined

disproportionately to Coates and other black employees.

Coates begins by stating that he received his PIP on December 1, 2003 for approving a

deal where the applicant had a recent large debt collection but that certain white employees only

received PDPs for "similar" conduct.  *See* Coates' Br. in Opposition to Nuvell's Mot. for Summ.

J. at 23-24 (comparing certain employees' PDPs to his December 1, 2003 PIP).  In this respect,

Coates first points to a PDP that Will Anderson received on March 15, 2004, for "similar"

conduct.  Coates omits, however, the fact that Anderson's March 15, 2004 PDP for approving

two deals without qualifying credit was issued – consistent with Nuvell's progressive discipline

scheme – after the successful completion of his previous PDP issued a year and a half earlier, on

October 1, 2002, for a bad capture rate and failing to meet his goal.  Coates' December 1, 2003

PIP, however, followed – again, consistent with Nuvell's progressive discipline scheme – the

unsuccessful completion of his October 15, 2003 PDP that was issued for, among other things,

lack of qualifying credit.  Coates and Anderson, then, were not similarly situated in all relevant

respects.

Coates next states that Jesse Hubbard received a PDP on June 25, 2003 for conduct

"similar" to his December 1, 2003 PIP.  Again, however, Coates fails to mention that Hubbard's

PDP on the date in question was his first for a bad decision deal.  Although Hubbard was issued

a PDP one month earlier, that particular PDP was for a separate infraction, namely failure to

make the minimum number of calls.  As previously noted, each infraction is typically dealt with

separately in terms of progressive discipline.  Moreover, Coates does not dispute that Hubbard,

despite successfully completing a PDP issued to him on June 15, 2004 for tardiness and failure to

call back approvals, was issued a PIP on October 13, 2004 for the same conduct.  Such

disciplinary action does not demonstrate disparate treatment and it is clear that Coates and

Hubbard were not similarly situated in all relevant respects.

The same is true of Jennifer Matheny, Laura Matthews Boole, Cheri Pruett, Aaron

Rocha, and Joann Smith.  Matheny's September 23, 2002 PDP for a poor underwriting decision

was her first infraction and was successfully completed prior to her second PDP on April 21,

2003 for a bad decision.  That PDP, in turn, was successfully completed prior to her third PDP

for a bad decision on October 21, 2003, all consistent with Nuvell's progressive discipline

scheme.  Coates omits that Matheny was subsequently issued a PIP for a bad decision on

November 19, 2003.  Similarly, Boole's March 27, 2003 PDP was her first infraction for a bad

business deal, and when she committed the same infraction some two months later, she, like

Coates, was issued a PIP on June 1, 2003, despite having successfully completed her March 27,

2003 PDP.  Coates argues that Boole was only issued a PDP on February 4, 2004, for bad

decision deals, but that infraction was some eight months after the June 1, 2003 PIP and

followed its successful completion.  Similarly, Pruett's September 16, 2003 PDP for approving a

deal in which there were previous repossessions followed the successful completion of a June 2,

2003 PDP for a bad deal and a September 3, 2003 PDP for the separate infraction of failing to

meet goals and answer calls.  Likewise, Rocha's February 28, 2003 PDP for a bad deal followed the successful completion of a previous PDP on November 20, 2002 for excessive number of disagrees on daily audits.  Smith's November 5, 2003 PDP for a poor credit decision, in turn, was her first infraction; she had no other disciplinary actions prior to and subsequent to that date. As was the case with Anderson and Hubbard, such disciplinary action does not demonstrate disparate treatment and it is clear that Coates and these individuals were not similarly situated in all relevant respects.

Coates does examine in more detail the disciplinary history of Shelly Sefcik and Amanda Strickland, both white females.  In this respect, Coates notes that Sefcik was disciplined nine times before she was demoted (compared to his earlier demotion), and that Strickland was promoted to a Senior Credit Analyst position despite disciplinary action taken against her.[23] Coates' reliance on these cases is misplaced.  Although it is true that Sefcik was disciplined nine times, only three of these actions were for poor decisions; the remainder of these actions were for various other issues, such as tardiness, personal phone calls, taking too many sick days, etc. Coates states in his surreply that Sefcik received a PIP on June 17, 2003 for an attendance issue, the duration of which was 90 days, but that she was then issued a PDP on July 14, 2003, also for an attendance issue, despite not successfully completing the June 17, 2003 PIP.  Coates misrepresents the record.  Sefcik's June 17, 2003 PIP was for excessive unscheduled absences. Sefcik was earlier issued a PDP on March 13, 2003 for this same conduct.  Thus, despite successfully completing her March 13, 2003, PDP for excessive absences, Nuvell skipped the

---

[23] Coates also states, without elaboration, that on May 1, 2004, Sefcik was promoted from Senior Discounter to Discounting Supervisor.  Coates does not set forth any circumstances surrounding this promotion, however, or any  differences in job duties, pay differences, qualifications of any other applicants, etc.  The document Coates submits to document this promotion – Ex. ZZ-12 – is blacked out in relevant respects.  The Court thus is unable to determine whether and to what extent, if any, this promotion demonstrates disparate treatment.

PDP and issued her instead a PIP some three months later for the same conduct.  This hardly

demonstrates disparate treatment.[24]  The PDP issued to Sefcik on July 14, 2003, in turn, was for

tardiness, the July 21, 2003 PDP was for excessive personal phone calls, and the December 17,

2003 PDP was for not clocking out for lunch, all separate infractions.  For her part, Strickland

only had one PDP – issued on December 4, 2003 – prior to her promotion.  This was her first

disciplinary action with no subsequent disciplinary action noted in the record.  *See* n.8, *supra*.

Sefcik and Strickland, then, were not similarly situated to Coates, and as was the case with the

other employees referenced above, the disciplinary history of these employees does not

demonstrate disparate treatment.

In addition to addressing his own disciplinary history and, at least in part, the disciplinary

history of certain white employees, Coates alleges that certain other black employees – Kena

Bryles, Linda Igbeka, Wonda London, Corlis Johnson, Kenneth Langston, and Sidney Piggee –

were disciplined disproportionately to similarly situated white employees.  Again, however,

Coates has failed to provide this Court with a complete disciplinary history of most of these

employees such that an appropriate comparison can be made and has misrepresented the record

with respect to others.  He states, for example, that Bryles was issued a PIP on August 4, 2003

for not hitting her goal for the past three months but that other white employees who missed their

goal were only issued a PDP.  The record, however, shows that Bryles was in fact only issued a

---

[24] Coates argues in his surreply that to issue to himself the August 5, 2004 PIP for failure to complete funding of a contract in a timely manner and failure to call automobile dealers on a daily basis to inform them of the status of their contracts violated Nuvell's progressive discipline scheme as he had successfully completed his January 30, 2004 PIP for failing to capture deals that could have been captured, and violated Nuvell's practices as he had worked as a Senior Discounter.  As noted, however, other white employees were issued PIPs despite successfully completing earlier PDPs, and Nuvell determined that a PIP was justified as Coates previously worked as a Discounter for three years with training and had previously been disciplined for performance inadequacies.  Such disciplinary action does not demonstrate disparate treatment and it is not this Court's function to second guess the wisdom or fairness of Nuvell's business practices.

PDP on August 4, 2003, for not hitting her goal – not a PIP as Coates alleges – and Coates in any case does not set forth the complete disciplinary history of those particular white employees he states were only issued PDPs for failing to meet their goal.  Without such a history, this Court cannot determine those employees' place within the progressive discipline scheme and the nature of any other disciplinary actions they may have received.[25]

Coates states that on October 29, 2001, Igbeka was placed on a PIP for having too many absences but that in 2003 and 2004 certain white employees were issued PDP's for absences or tardiness.  He also states London was issued a PIP on June 4, 2002 for not calling back an approval but that certain white employees were issued PDPs in 2003 and 2004 for "similar" conduct.  What Coates omits, however, is that prior to September 2002, Nuvell had one disciplinary action form that was referred to as a Performance Improvement Plan.  Each employee that was placed in the progressive discipline process was issued this form.  On this form, however, were various different levels of discipline – Levels 1-4.  In this respect, a Level 1 discipline, while termed at the time a PIP, was equivalent to a PDP in the current system of progressive discipline that came into effect in September 2002.  *See* Generally Eisenhauer Supp. Aff. at ¶ 10.  Both Igbeka and London received Level 1 discipline with respect to the PIPs Coates references.  These employees, then, were not treated disproportionately to the white employees Coates identifies.[26]

---

[25] Coates also states in his surreply that Bryles was issued a PDP on October 21, 2003, for a bad decision deal, but that despite successfully completing this PDP, she was then issued a PIP on December 31, 2003.  This subsequent PIP, however, was for approving an applicant that was in Chapter 13 bankruptcy, directly contrary to Nuvell policy.  It was noted on her PIP that "[a] mistake of this magnitude must go directly to Performance Improvement."

[26] Coates states that during the years 2001, 2002, 2003, 2004, 2005, Nuvell placed a total of 17 employees on a PIP, with whites accounting for 10 or 58.8%, and blacks accounting for 5 or 29.4%.  Coates states, however, that of the five blacks placed on a PIP, all suffered adverse employment action, while only 3 of the 10 whites suffered the same fate.  Coates does not analyze, however, the number or nature of the PIPs that were issued prior to September 2002 when the current progressive

Coates goes on to allege that Johnson, Langston, and Piggee were all terminated after relatively short periods of time but he does not give the circumstances of their termination, *see* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 37, and the disciplinary history he sets forth with respect to these employees (as well that of Bryles), lacking as it does context and presented outside the progressive discipline system, does not demonstrate on its face disparate treatment.

In sum, Coates has not demonstrated with the above evidence that he and other black employees were treated in a disparate manner and that "similarly situated white employees receive[d] more favorable terms and conditions of their employment ... [concerning] discipline." *See* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 19.  Moreover, Coates notes that while serving in the capacity as Credit Analyst he was supervised by various individuals, and he states that the credit policies of Nuvell are often vague and, depending on the manager, the policy is applied differently.  In this respect, the majority of the PDPs and PIPs addressed by Coates involved different managers.[27]  *See Kohler*, 335 F.3d at 776 (noting that the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances).  Although Coates and the other employees to whom he refers may have violated the same policy with, in some cases, differing results given their disciplinary history or the nature of the specific infraction, Nuvell's policy does not require progressive discipline in all

---

discipline scheme came into effect, namely whether any such PIPs were the equivalent of PDPs.

[27] Coates states that the name of Tom Jester, as previously noted Senior Vice President of Credit, appears on all these PDPs and PIPs, but Coates does not argue, and the record does not indicate, that Jester directed the action taken by the various managers or otherwise influenced their decision.

cases, *cf. Rodgers*, 417 F.3d at 854 (rejecting argument that only white employees benefitted from progressive discipline policy in part because policy in question did not require progressive discipline in all cases), and "'the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers except to the extent those judgments involve intentional discrimination.'" *Id.* (quoting *Hutson*, 63 F.3d at 781).  Coates has not, on this record, demonstrated that the legitimate, nondiscriminatory reasons advanced by Nuvell for the adverse employment actions taken against him were pretextual.[28]

b.

The Court now turns to Coates' retaliation claim, to which Coates devotes little analysis. *See* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 39-42; Coates' Surreply to Nuvell's Reply at 7-8.  As an initial matter, Coates claims that the evaluation he received on January 12, 2001, was discriminatory and retaliatory and that his evaluation was changed as a result of his complaints.  *See* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 39-40. To the extent he is claiming there is a causal connection between his January 2001 evaluation and the more recent employment actions alleged to be retaliatory, *i.e.,* the October 15, 2003 PDP, December 1, 2003 PIP, January 30, 2004 PIP, February 13, 2004 PIP, February 16, 2004 demotion to Senior Discounter, August 5, 2004 PIP, and September 29, 2004 PIP, the Court finds that Coates has failed to demonstrate such a causal connection given the significant lapse

---

[28] As previously noted, Coates claims with respect to many of these disciplinary actions that he was instructed to do whatever was necessary to make the deal work and then being punished for doing so.  Even assuming this assertion were true – which has not been demonstrated – similarly situated white employees were apparently treated in the same manner given the frequency and nature of their disciplinary actions that are contained in the record.

32

of time between the various events.  *See Kasper v. Federated Mutual Insurance Co.*, 425 F.3d

496, 503 (8th Cir. 2005) (noting that "[a] gap in time between the protected activity and the

adverse employment action weakens an inference of retaliatory motive").

Coates also claims in his second EEOC charge filed on February 11, 2004, that his

October 15, 2003 PDP and his January 30, 2004 PIP were in retaliation for filing his first EEOC

charge on August 14, 2000.  *See* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 40

(Ex. DDD).  Again, however, given the significant lapse of time between Coates' August 2000

EEOC charge and his October 15, 2003 PDP and January 30, 2004 PIP, the Court finds that

Coates has failed to establish a causal connection between the protected activity and the

challenged  employment action.  *Cf. Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir. 2004) (no

causal connection where ten months elapsed between the plaintiff's discrimination charge and

her subsequent discharge).  Similarly, given the lapse of time between Coates' amended EEOC

charge on March 1, 2004 and his August 5, 2004 PIP, the Court finds that Coates has failed to

establish a causal connection between the protected activity and the challenged employment

action.

Coates does claim, however, that when he received his PIP on December 1, 2003, he

refused to sign it, contending he was the victim of discrimination, retaliation, and harassment by

management, presumably for complaining to Nuvell that his October 15, 2003 PDP was

discriminatory.  *See* Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 40; Coates'

Resp. to Nuvell's St. of Mat. Facts at ¶ 95.  He also claims retaliation following each successive

disciplinary action to which he was subjected, *i.e.*, his January 30, 2004 PIP, his February 13,

2004 PIP, his February 16, 2004 demotion, his August 5, 2004 PIP, and his September 29, 2004

PIP.  Throughout these disciplinary actions, however, Nuvell was expressing concern about Coates' performance and many of these disciplinary actions – including his demotion – were a continuation of performance issues raised in previous disciplinary actions.  "Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."  *Kasper*, 425 F.3d at 504 (citing *Smith v. Ashland, Inc.*, 250 F.3d 1167, 1174 (8th Cir. 2001)).  Although Coates filed an EEOC charge on February 11, 2004, he acknowledges that at the time he was offered the option of resignation or demotion on February 13, 2004, no one at Nuvell had knowledge that Coates had filed his February 11, 2004 EEOC Charge as this information had not yet been received by Human Resources, let alone communicated to any of Coates' managers.  The Court thus finds no causal connection between Coates' claim of retaliation and the disciplinary actions of which he complains.

Assuming, however, Coates established a prima facie case of retaliation, Nuvell articulated legitimate, nondiscriminatory reasons for each of the disciplinary actions of which Coates complains and Coates has not demonstrated that these reasons were pretextual.  "One method of proving pretext is to show that the employer's proffered explanation has no basis in fact."  *Logan*, 416 F.3d at 881 (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)).  This Coates has failed to do.  Coates, as previously noted, does not specifically dispute in his response to Nuvell's motion for summary judgment and statement of material facts the underlying factual basis for these PIPs and his demotion (other than conclusory denials therein that do not, for the most part, address the substance of these disciplinary actions), or that Nuvell articulated legitimate, nondiscriminatory reasons for each of these actions.  Rather, Coates contends that he was the victim of retaliation when he was continuously placed on PDPs

34

and PIPs and demoted for issues that similarly situated white employees were not and that this evidences pretext.  Coates' Br. in Opposition to Nuvell's Mot. for Summ. J. at 22, 41.  Coates' retaliation claims, however, fail for essentially the same reasons as his disparate treatment claims.  As noted above, Coates has not demonstrated that he and other black employees were treated in a disparate manner and that similarly situated white employees received more favorable terms and conditions of their employment concerning discipline.  Coates simply has not created a genuine issue of material fact that the legitimate, nondiscriminatory reasons for his December 1, 2003 PIP, January 30, 2004 PIP, February 13, 2004 PIP, February 16, 2004 demotion, August 5, 2004 PIP, and September 29, 2004 PIP were pretextual, and his conclusory, unsupported assertions that he was treated unfairly with respect to each of these employment actions do not, on this record, raise an inference of retaliation.


III.

For the foregoing reasons, the Court finds that Nuvell's motion for summary judgment should be and hereby is granted.  Judgment will be entered accordingly.


IT IS SO ORDERED this 16th day of December, 2005.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

35